Michael L. Abbott, Esq. CSB 148917
Law Offices of Michael Abbott
126 South Third Avenue
Oakdale, CA 95361
Telephone: (209) 844.5633
Facsimile: (209) 844.5632
E-MAIL: solvableproblems@gmail.com

Attorney for Creditors and Defendants, K.S. Aviation, Inc., John Yoon, Chen Zhao, aka Eric Zhao, Xing Kong Aviation Services, LLC

UNITED STATES BANKRUPTCY COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA – Oakland Division

| | |
|---|---|
| In Re:<br><br>DANIEL B. YOON AND JEENEE YOON,<br><br>Debtors. | CASE NO. 19-42763<br>Chapter 11 Proceedings<br><br><br>OBJECTION TO DEBTORS' PLAN OF REORGANIZATION<br><br>DATE: APRIL 30, 2021<br>TIME: 11:00 A.M.<br><br>Judge: Hon. Charles Novack |

Creditors, Defendants and Counter-Plaintiffs, K.S. Aviation, Inc., John Yoon, Chen Zhao, aka Eric Zhao, Xing Kong Aviation Services, LLC, defendants in the above-captioned Chapter 11 Case (collectively referred to herein as "Defendants"), file this OBJECTION TO DEBTORS' PLAN OF REORGANIZATION as follows:

1. <u>Adoption and Incorporation of Trustee's Objections</u>. Defendants adopt and incorporate in their entirety the objections interposed by the Chapter 11, Subchapter V Trustee.

2. <u>Debtor's Reliance Upon Recovery in Litigation.</u> Debtors offer to fund their Reorganization plan with 25% of the proceeds of what they hope to gain from litigation with and against Defendants. Debtors do not offer an amount of this "blue sky" asset, nor can they. Debtors do not believe in their own claims and have argued previously that they would have no

such claims if they did not prevail in the Superior Court on their defense to Defendants' cross-complaint. They did not prevail on the cross-complaint. Now, they amend their facts and allegations to allege the opposite, hoping this Court will not notice the duality of their pleadings and alternating litigation posture.

In Yoon v K.S. Aviation, et al., Merced County Superior Court Case Number 17CV-00630, Judge Ronald Hansen bifurcated the cause to try Defendants' cross-complaint first. Defendants' cross-complained to enforce the terms of the Settlement Agreement between the parties. A true and correct copy of the Settlement Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference. Debtors alleged that the Settlement Agreement was not enforceable and could not be enforced.

In their "Trial Brief – Limited Issue: Settlement Agreement", a true and correct copy of which is attached hereto and incorporated herein as Exhibit "B", in Case Number 17CV-00630, Debtors alleged as follows:

> Illusory Contract: Scholars define illusory contracts by what they are not.
> As Corbin observes, "if a promise is expressly made conditional on something that the parties know cannot occur, no real promise has been made. Similarly, one who states 'I promise to render a future performance, if I want to when the time arrives,' has made no promise at all. It has been thought, also, that promissory words are illusory if they are conditional on some fact or event that is wholly under the promisor's control and bringing it about is left wholly to the promisor's own will and discretion." (2 Corbin on Contracts, (1995), § 5.32, pp. 175-176. Thus, an unqualified right to modify or terminate the contract is not enforceable. (See id. at p. 177; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 233, p. 241.)
>
> "An agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable." (Automatic Vending Co. v. Wisdom (1960) 182 Cal.App.2d 354, 357 [6 Cal. Rptr. 31]. For the contract to bind either party, both must have assumed some legal obligations. Without this mutuality of obligation, the agreement lacks consideration and no enforceable contract has been created. (Shortell v. Evans-Ferguson Corp., 98 Cal. App.150, 660-6621[277 P. 519]; 1 Corbin, Contracts (1950), § 152, pp. 496-502.) [3] Or, if one of the promises leaves a party free to perform or to withdraw from the agreement at his own unrestricted pleasure, the promise is deemed illusory and it provides no consideration. See J. C. Millett Co. v. Park & Tilford Distillers Corp. [N.D. Cal.], 123; F. Supp. 484, 493)
>
> 'Where a contract imposes no definite obligation on one party to perform, it lacks mutuality of obligation. If is elemental that where performance is optional with one of the parties no enforceable obligation exists. [Citations.]' " (Kowal v. Day (1971) 20 Cal.App.3d 720, 724 [98 Cal. Rptr. 118].)

An agreement is illusory and there is no valid contract when one of the parties assumes no obligation. [Citation.]" (Scottsdale Ins. Co. v. Essex Ins. Co. (2002) 98 Cal.App.4th 86,94-95.)

The settlement agreement signed by Plaintiff on September 3 provides the following language:

"any funds owed to Dan that are clearly and legally documents as official loans by Dan to the corporation will be determined by an accredited outside and neutral Certified Public Account. Such funds will be repaid one the Company has regained its financial footing and all past due debts are brought current, all pending judgements against the Company are resolved and that sufficient operating capital is on hand to meet current business requirements including update of the aircraft fleet and; maintenance operations. Further, in consideration of Dan Yoon's family, in approximately 12 to 18 months, subject to the complete financial recovery of KS Aviation Inc., and all its associated entities, a sum of money, to be determine by the board of directors and any future investors will be provided to Dan Yoon and family, based on the following conditions:

a)    The company has shown continued trend toward growth and profitability.
b)    When, if and as an investor purchased equity in KS Aviation Inc. And its entitles, the investor will have the right to determine the amount of funds given to Dan Yoon."

The above language destroys Plaintiffs' ability to enforce repayment of sums loaned to KS until plaintiff can establish:

1)    . KS has regained its financial footing;
2)    . All past due debts are brought current;
3)    . All pending judgements against the Company are resolved;
4)    . Sufficient operating capital is on hand to meet current business requirements including update of the aircraft fleet and maintenance operations; and finally:
5)    . Investor will have the right to determine the amount of funds given to Dan Yoon.

These conditions for repayment make this contract illusory.

Debtors denied at length that they had any agreement with Defendants. Judge Hansen disagreed and so stated in his "Statement of Decision," a true and correct copy of which is attached hereto as Exhibit "C."

Undaunted by their prior position and testimony, Debtors now promote this "illusory" and "unenforceable" contract as the funding source for their plan in bankruptcy. Debtors can have

their own opinions, even if from time to time they completely alter their reality to fit their current posture, but they cannot have their own facts.

The facts of the other litigation promoted by Debtors as a funding source, <u>Yoon v. Kim, et al.</u> is equally illusory and not discussed in any way in these proceedings. In that action, Debtors allege the same allegations as are debunked in their Merced County action, and essentially sue a number of people for having sued Debtors. Not only is there no status or intended resolution date for these claims, but there is also no discussion of the facts of the Los Angeles case in any way, and for good reason. Should the Court take even a glancing glimpse of that complaint, it will become immediately apparent that Debtors are selling nothing at all.

At a minimum, the two cases of which Debtors would pledge 25% of their winnings, are dubious and disputed. These cases cannot form the basis of any intended funding for Debtors' bankruptcy plan.

Respectfully submitted.

Dated: April 23, 2021

Law Offices of Michael Abbott

By : _____

Michael L. Abbott
Law Offices of Michael Abbott
126 South Third Avenue
Oakdale, CA 95361
solvable problems@gmail.com

# SETTLEMENT AGREEMENT

## AND MUTUAL GENERAL RELEASE

This Settlement Agreement and Mutual General Release (hereafter referred to as the "Agreement") is entered into as of April 12, 2016, by and between, John Yoon, an individual, (hereinafter "John"), on the one hand and Dan Yoon, an individual, (hereinafter referred to as "Dan") on the other hand. John and Dan may hereinafter collectively referred to as the "Parties" in this Agreement.

## RECITALS

A.     On or about June 29, 2015, John filed an action in Merced County Court Case No.: 15CV-01844 against Dan and other entities including KS Aviation, Inc., and on or about July 7, 2015, Dan filed an action in Merced County Court Case No.: 15CV01903 against John. Both cases are pending at this time is the same court.

B.     The Parties to this Agreement hereby wish to and intend to resolve any and all disputes between them underlying or within the Actions and any and all claims related thereto.

## SETTLEMENT TERMS

**NOW, THEREFORE**, for good and valuable consideration, including the mutual promises and agreements set forth herein, the Parties to this Agreement do hereby agree to the following terms and conditions:

(1)     Dan agrees that he shall withdraw from the daily affaires of the KS Aviation, Inc. or executive duties and responsibilities as a senior executive or as a member of the Board of Directors of KS Aviation, Inc. including Sierra Academy of Aeronautics. Therefore, effective on the date indicated above, Dan shall tender his resignation as CFO of KS Aviation, Inc. and any and all other positions, as well as his membership on the Board of Directors.

(2)     Dan shall relinquish all his shares of stock in KS aviation, Inc., however any funds owed to Dan that are clearly and legally documented as official loans by Dan to the corporation will be determined by an accredited outside and neutral Certified Public Accountant.

EX. "4"

(3)     As of effective date of above, Dan agrees to return any and all company property, including vehicles, computers, telephones, software, keys and any all airport security passes.

(4)     Dan further agrees and recognizes that the simulator facility and its contents are not part of the EB-5 regional investment program, thus said facility and its contents are belong to KS Aviation, Inc.

(5)     Dan further agrees that he will drop all pending lawsuits against John which is explained above within Fourteen (14) days from the effective date of above and agree that John shall resume his position as Chairman, President and CEO of KS Aviation, Inc. John agrees drop all pending lawsuits against Dan within Ten (10) days from the date when John received Dan's resignation of all positons in KS Aviation, Inc. and all conditions and terms are satisfactory in this agreement.

(6)     In return to Dan's promise in this agreement, John and KS Aviation, Inc. shall relinquish all their shares in the Sierra Air Center Development, LLC (John's 20% and KS Aviation, Inc.' 40%). Therefore, John and KS Aviation, Inc. shall recognize full 100% ownership of Dan in the Sierra Air Center Development, LLC which is related to the EB-5 regional center investment program.

(7)     The Parties also stipulate that the Court where the Action is currently pending shall retain jurisdiction to enforce and/or construe any and all terms of this Agreement.

(8)     The Parties also stipulate, agree and acknowledge that this Agreement is binding and enforceable pursuant to the provisions of California *Code of Civil Procedure* section 664.6, and shall request the Court where the Action is currently pending to retain jurisdiction to enforce and/or construe any and all terms of this Agreement. -

## ADDITIONAL AND GENERAL TERMS

In addition to the foregoing, the Parties to this Agreement hereby agree to the following additional and general terms:

(6)     <u>Incorporation of Recitals and Settlement Terms</u>. The Recitals and Settlement Terms set forth hereinabove are incorporated herein by reference.

(7)     <u>No Admission of Liability</u>.  It is expressly understood and agreed by and between the Parties that neither Party is expressly admitting any liability or fault and that this Agreement is entered into solely because the relative expense of continued assertion of their positions is likely to exceed the costs of compromise and settlement.

(8)     <u>Consideration</u>. Each Party acknowledges that the claims underlying the Action remain disputed and unresolved.  In consideration of this Agreement, each Party agrees to dismiss the claims each Party has or might have against the other Party.  Each Party shall bear their own attorneys' fees.

(9)     <u>Administrative Proceedings or Other Litigation</u>.  The Parties hereby expressly warrant and covenant that they have not initiated any administrative proceedings or litigation with respect to the subject matter of this Agreement and, further, expressly agree not to initiate any such administrative proceedings or litigation in the future.

(10)    <u>Mutual Release of ALL Claims.</u>  With the exception of any and all terms and conditions set forth in this Agreement,  the Parties each release and discharge, to the fullest extent of the law, each other and each of the other's respective affiliated, subsidiary, related and parent corporations, successors, assigns, officers, directors, shareholders, employees, agents, servants, beneficiaries, representatives, insurers, and/or attorneys, and each of them, and all persons and/or entities acting by, through, under or in concert with such persons and/or entities, from any and all actual or potential claims, obligations, debts and causes of action of any kind or nature whatsoever, whether known or unknown, prior to the effective date of this Agreement, including without limitation acts and/or omissions, based on, arising out of, in connection with, or relating in any way to any dealings between each Party on the one hand, and any other Party on the other, with regard to the generality of the foregoing, any of the matters described in the Action, and/or the filing and prosecution of this Action by the Parties of this Action.

All Parties to this Agreement acknowledge that they have been advised by legal counsel and are familiar with the provisions of California Civil Code, Section 1542, which presently provides as follows:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing this release, which if known by him must have materially affected his settlement with the debtor."**

Being aware of this code section, unless otherwise provided herein in this Agreement, each Party hereby expressly waives and relinquishes all rights and benefits which they may have thereunder as well as under any other statute or common law principle of similar effect.

Each Party understands that the facts in respect to which the releases made in this Agreement are given may hereafter turn out to be other than or different from the facts in that connection now believed by each Party to be true; and each Party hereto accepts and assumes that risk and agrees that this Agreement shall be, and remain, in all respects effective and not subject to termination or rescission by virtue of any such different facts.

(11)     <u>Assignment, Indemnification and Hold Harmless</u>.  Each Party represents and warrants that they have not heretofore assigned or transferred, or purported to assign or transfer to any person, firm or corporation whomsoever any claim, debt, liability, demand, obligation, cost, expense, action or causes of action herein released.  Each Party agrees to indemnify and hold the other harmless from any and all claims, debts, obligations, demands, costs, expenses, actions or causes of action based on, arising out of or in connection with any such transfer or assignment or purported transfer or assignment.

(12)     <u>Lack of Inducement</u>.  Each Party acknowledges that, except as herein expressly set forth, no representations of any kind or character have been made by any other Party, or by any of the other party's agents, partners, any other person, representative, or attorney, to induce execution of this Agreement.

(13)     Representation by Counsel.  Each Party acknowledges that they have been represented by separate and independent counsel throughout all of the negotiations which preceded the execution of this Agreement and in connection with the preparation and execution of this Agreement.  Each party acknowledges that they have each read this Agreement before executing it, that they have had counsel review it, and have had the opportunity to have counsel explain the significance of this Agreement to each party.  Each party shall bear its own legal costs and attorneys' fees.

(14)     Further Assurances.  The Parties hereby agree to cooperate in good faith in performing their mutual obligations and intentions in this Agreement, including, without limitation in any manner by the foregoing, taking all necessary actions and executing any other documentation necessary to effectuate the provisions of this Agreement.

(15)     Binding Agreement.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, representatives, successors and assigns, agents, attorneys, and/or partners.

(16)     Forbearance.  Each Party agrees to forever refrain and forbear from commencing, instituting or prosecuting any lawsuit, action, or other proceeding against the other Party or any other related unnamed party, based on, arising out of or in connection with any claim, debt, liability, demand, obligation, cost, expense, action or causes of action released and/or discharged by reason of this Agreement.

(17)     Attorneys' Fees.  In the event any action is commenced by any Party hereto to enforce and/or construe any of the terms, conditions and/or any other matter in connection with this Agreement, the prevailing party in any such action shall be entitled to recover attorneys' fees and costs incurred by the prevailing party, as allowed by law.

(18)     Choice of Law.  This Agreement is made and entered into in the State of California and shall be governed by, interpreted and enforced according to the laws of the State of California.

(19)     Warranty of Authority.  The signatories hereto each represent and warrant

that they are authorized to enter into and sign this Agreement on behalf of the person or entity on whose behalf they are designated as executing this Agreement.

(20)    Severability.  In the event any covenant, condition, or other provision herein is held to be invalid, void, or illegal, the same shall be deemed severed from the remainder of this agreement and shall in no way affect, impair or invalidate any other covenant, condition, or other provision herein.  If any covenant, condition, or other provision herein is held to be invalid due to its scope or breadth, such covenant, condition, or other provision shall be deemed valid to the extent of the scope of breadth permitted by law.

(21)    Ambiguities or Uncertainties.    This Agreement, and any ambiguities or uncertainties herein, shall be equally and fairly interpreted and construed without reference to the identity of the party or parties who prepared this document, on the express understanding and agreement that the parties participated equally in the negotiation and preparation of the Agreement, or have had equal opportunity to do so.  Accordingly, the Parties hereby waive the benefit of California Civil Code section 1654, and any equivalent federal rule of law, providing that in cases of uncertainty, language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

IN WITNESS WHEREOF, the Parties hereto have set their hands as of the day and year indicated below.


DATED: _____, 2016

_____
John Yoon


DATED: _____, 2016

_____
Dan Yoon


**APPROVED AS TO FORM:**

DATED: _____, 2016

_____
Vincent S. Kim, Esq.
Attorney for John Yoon


DATED: _____, 2016

_____
Cyril L. Lawrence
Attorney for Dan Yoon

1  **CYRIL LAWRENCE, INC.**
   A PROFESSIONAL LAW CORPORATION
2  2111 "K" Street
   Merced, California 95340
3  Tel:   (209) 383-6854
   Fax:   (209) 383-6856
4  Email: lawoffice@cyrillawrence.com

5  Cyril L. Lawrence, State Bar No. 50975
   Eric S. Beiswanger, State Bar No. 263995
6
7  *Attorney for:* Cyril Lawrence, Inc.

8      **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
          **IN AND FOR THE COUNTY OF MERCED**
9

10  DAN YOON,                          **CASE NO.: 17CV-00630**

11              Plaintiff,             **TRIAL BRIEF - LIMITED ISSUE:**
        vs.                            **SETTLEMENT AGREEMENT**
12
    **K.S. Corporation; AND DOES 1-10,**
13  **inclusive**                      HEARING DATE:   AUGUST 06, 2019
                                       TIME:           10:00 A.M.
14              Defendants.            DEPARTMENT      TBA

15

16

17

18

19

20

21

22

23

24

25

26

27                          - 1 -
                    Trial Brief before Trial
28

Ex. "B"

17CV-00630
.B
Brief
213663

Case: 19-42763   Doc# 159   Filed: 04/23/21   Entered: 04/23/21 16:24:24   Page 12 of
40

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS' OF RECORD:

Under California Rules of Court, Rule 5.394. Plaintiff submits the following Brief Before Trial for the Trial scheduled for September 6, 2019 at 10:00 a.m. in the above referenced action.

1. **The Parties and Representatives:**

Danial Yoon ("Plaintiff") is represented by Cyril Lawrence and Eric S. Beiswanger from Cyril Lawrence, Inc. KS Aviation ("Defendant") is represented by the Law Offices of Michael Abbott.

2. **A Summary of the Facts leading up to Signed Settlement Agreement:**

• In 2003, John Yoon ("John") created Defendant corporation ("KS") to acquire from the bankruptcy court a flight school training Asian pilots at the Oakland Airport. The price included KS's assumption of $1.6 million dollars in flight school debt. By early 2004, John had exhausted his resources, and unable to service his debt. He contacted Plaintiff seeking a cash investment of $300,000. Plaintiff ended up investing $500,000 in 2004, and received 500,000 shares of KS stock which made Plaintiff a 50% shareholder in KS.

• Plaintiff immediately took over management, while John focused on sales. To save money, the flight school relocated to the Livermore airport in 2004. Plaintiff then sold property to raise money for a building at the Livermore airport. Plaintiff put up the money, but title to the building was put in both Plaintiff and John's name because John agreed to pay half the cost. When John said he could not come up with the money, he signed a promissory note for his share of the building's costs. When John failed to make any payments under his note, he had KS issue additional

- 2 -
Trial Brief before Trial

This e-copy is the official court record (rev. 06/09)

This e-copy is the official court record.

shares in Plaintiff. That became their arrangement, from 2004 to 2008, Plaintiff personally funded KS's negative cash flow and received a series of promissory notes. John, while receiving salary and perks from KS made no capital contributions.

- In 2008, KS relocated its flight school to Castle Air force Base. The Livermore building was sold, and the proceeds used to buy more aircraft for training. Plaintiff continued to fund KS's negative cash flow through 2013. In late 2013, KS acquired a Boeing 737 simulator for $5 million dollars to expand its training operations. Two million dollars came from KS, the balance from SBA and a Bank of the West loan. The simulator loans were personally guaranteed by the Plaintiff and his family.

- In late 2013, John had a serious motorcycle accident, and could not work. KS continued John's wages and benefits while Plaintiff assumed both management and sales. When John returned to work in February 2014 (part time), he began arguments over Plaintiff's management of the flight school, then disappear for the day. In 2014, KS had its first profitable year, generating over $1 million dollars profit on $14 million gross sales.

- Unbeknownst to Plaintiff, John stole a number of checks from KS's accounting office and wrote a $25,000.00 check to Vincent Kim, a Los Angeles attorney to file a derivative action. John was looking to take over KS's management. When the derivative action stalled, John made false claims to the Merced County District Attorney ("DA") that Plaintiff was stealing money from the flight school, and had forged his signature on corporate documents. Relying on John's allegations, the DA filed a felony complaint and made a referral to Internal Revenue Service ("IRS").

- 3 -
Trial Brief before Trial

This e-copy is the official court record (LR 60-1(h))

1    The IRS appeared at KS one morning with a dozen special agents who seized all of
2    the KS's accounting records.

3         • John then with the help of the disgruntled employees, began a
4    coordinated effort to discredit Plaintiff with KS's customers, the Asian airlines John
5    use to service.  John asked KS's chief pilot to contact the local Flight Inspection
6    Safety Office ("FISDO") to claim that KS's aircraft were unsafe.  The chief pilot's job to
7    ensure student safety, that all student operated equipment were properly maintained.
8    If any airplane was unsafe, the chief pilot has the authority to ground that airplane
9    pending repairs.  Instead of notifying senior management, the chief pilot contacted
10   FISDO directly.  Plaintiff terminated the Chief Pilot, then turned his attention to the
11
12   FISDO 's inspections.
13

14        • FISDO grounded all of KS's aircraft for three days for inspections.
15   After flight training resumed, FISDO's only recommendation was to add a second
16   Chief of Maintenance to keep better maintenance records.  Dan complied, but the
17   inspection and it's findings were damage to KS's Asian clients.

18        • John did not relent, he made certain that Defendant's airline
19   customers knew that Plaintiff had been charged with felony; that he was stealing
20   money from the flight school; that the IRS was investigating; and now the flight
21
22   school's had FISDO's problems.   He urged the airlines to withhold payment.  The
23   airlines complied. By the end of 2015, the airlines had withheld over $2.5 million
24   dollars in student payments, had withdrawn some student from the flight school and
25   started refusing to sending new students. Defendant's gross income dropped to under
26   $3 million dollars.  Its unpaid receivables grew to over $3 million dollars.  This forced
27                                            - 4 -
28                              Trial Brief before Trial

Plaintiff to personally guaranteeing vendor payments in order to obtain fuel deliveries and use his personal credit cards to cover student's returning to Asia. John's multi-pronged tactics had its effect.

- In 2016, Bank of the West who provided half the financing for the 737 Simulator obtained a judgment for $2.4 million dollars against the KS and Plaintiff's guarantee. From April 2016, Plaintiff was trying to find some way to turn over KS's management. John was claiming he has an investor willing to put $2 million dollars into KS. By the end of August, when John's mother died, Plaintiff realized could no longer cover KS's payroll.

- After ten years of hard work, without compensation (Plaintiff took no salary), after investing over $3 million dollars in KS, plus guaranteeing $3.9 million dollars of KS debt, Plaintiff's resources were exhausted. KS was a shell of its former self and its creditor's, Bank of West were pursuing Plaintiff's personal guarantees. A pre-judgment Receiver had been appointed, all the while, John was claiming he had $2 million dollars to invest in KS, provided Plaintiff withdraw from management. Plaintiff went to LA, the funeral, hoping to find a way to turn over KS's management.

3. **Facts Surrounding the Execution of Settlement Agreement:**

- John's mother's funeral was set for Thursday, September 1. Plaintiff received a call from John's lawyer, Vincent Kim asking it he would attend out of respect for the family. Plaintiff agreed. That Thursday he ended up sitting next to Kim and his wife.

- Following the services, Kim asked Plaintiff to visit his office stating "he would help me." Aware of John's claim of $2 million dollars of new capital, Plaintiff

- 5 -
Trial Brief before Trial

This e-copy is the official court record (see CCP 263).

agreed. He was under a lot of stress, the criminal complaint; the IRS investigation; and the FISDO complaints were all taking its toll. Mrs. Yoon was operating the family restaurant in Berkeley and had a nervous breakdown over the possibility her husband could go to jail; that the IRS was now auditing their restaurants; and the intra family's stress from their money problems. Petitioner was using the income from the restaurants to cover KS's bills. And the family's reputation in the Korean community had been destroyed.

● Kim said he had experience in criminal matters and aware of DA procedures. Without his and John's help, Plaintiff was facing jail. But, if Plaintiff stepped down from KS, he and John would work to minimize the criminal charges, and civil litigation. Kim told Plaintiff to return to his office the next day on Friday September 2, he would prepare the papers.

● When Plaintiff failed to return that Friday, Kim called him after 10pm, telling him he needed to return to Los Angeles to sign the agreement. Plaintiff agreed believing he was relinquishing only management. Plaintiff returned to Kim's office on Saturday September 3, 2016, with his son Jong-Ki. An argument ensued when Jong-Ki urged his father not to sign. John and Kim told Jong-Ki, let the adults in the room decide. Again, Kim and John were telling Plaintiff he could go to jail if they did not intervene in the criminal case. If Plaintiff signed, they would help make the criminal, tax and civil litigation go away. Plaintiff signed.

● On Tuesday September 6, 2016, Plaintiff called his attorney stating he and John had reached an agreement, the complaint (derivative action) was being

- 6 -
Trial Brief before Trial

dismissed, so the cross - complaint must be dismissed. Counsel dismissed the cross complaint without prejudice on September 6, 2016.

### 4. Legal Issue:

• The court has indicated a limited trial on the enforceability of the parties "settlement agreement." Plaintiff asserts the agreement is unenforceable for numerous reasons including the Plaintiff's counsel's violation of State Bar Rules of Professional Conduct, Rule 2-100.

### 5. Law and Argument:

Attorney Misconduct and Misrepresentation: An essential element of every contract is that the parties enter into it, knowingly and consensually, not through fraud, duress, menace, undue influence or mistake. If consent to entering into a contract is obtained by any of the foregoing elements, a court may declare the entire contract unenforceable. To form an enforceable contract the parties' consent must be free. (Civ. Code, § 1565.) Apparent consent is not free when obtained, inter alia, through duress, menace, or fraud. (Civ. Code, § 1567.) California law is clear that an agreement obtained by threat of criminal prosecution constitutes menace and is unenforceable as against public policy. (See *Tiffany & Co. v. Spreckels* (1927) 202 Cal. 778, 784 [262 P. 742] [contract obtained by threats of prosecution illegal and voidable]; *Helmick v. Thomas* (1960) 187 Cal.App.2d 395, 397 [9 Cal.Rptr. 512] [threat of criminal prosecution constitutes sufficient menace to obviate free consent rendering agreement unenforceable]; *Shasta Water Co. v. Croke* (1954) 128 Cal.App.2d 760, 764 [276 P.2d 88] [threat of criminal prosecution constitutes menace destructive of free consent and renders agreement void].)

- 7 -
Trial Brief before Trial

Here, the facts are undisputed, Plaintiff was facing a criminal indictment for fraud. KS's attorney used that information as part of his effort to obtain Plaintiff's signature on the disputed settlement agreement on September 3, 2016. Without opposing counsel's knowledge, or consent, Kim repeatedly met with Plaintiff in his attempt to gain his trust to sign a settlement agreement that was not presented to opposing counsel.

The evidence will also show that the Kim provided three revised versions of his agreement through 10pm on Friday September 2 in an attempt to gain Plaintiff's trust. In one instance, Kim claims he was provided with an approved version from opposing counsel, but the agreement Kim presented was redlined for Plaintiff's consideration, not a version approved by counsel for signature. None of the standard "approved as to form" acknowledgments appear in this agreement.

And there is no unequivocal written communication from Plaintiff's counsel that confirms consent to or approval of the settlement agreement provided by Kim.

Illusory Contract: Scholars define illusory contracts by what they are not. As Corbin observes, "if a promise is expressly made conditional on something that the parties know cannot occur, no real promise has been made. Similarly, one who states 'I promise to render a future performance, if I want to when the time arrives,' has made no promise at all. It has been thought, also, that promissory words are illusory if they are conditional on some fact or event that is wholly under the promisor's control and bringing it about is left wholly to the promisor's own will and discretion." (2 Corbin on Contracts, (1995), § 5.32, pp. 175-176.) Thus, an unqualified right to modify or

- 8 -
Trial Brief before Trial

terminate the contract is not enforceable. (See id. at p. 177; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 233, p. 241.)

"An agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable." (*Automatic Vending Co. v. Wisdom* (1960) 182 Cal.App.2d 354, 357 [6 Cal. Rptr. 31].) For the contract to bind either party, both must have assumed some legal obligations. Without this mutuality of obligation, the agreement lacks consideration and no enforceable contract has been created. (*Shortell v. Evans-Ferguson Corp.*, 98 Cal. App. 650, 660-662 [277 P. 519]; 1 Corbin, Contracts (1950), § 152, pp. 496-502.) [3] Or, if one of the promises leaves a party free to perform or to withdraw from the agreement at his own unrestricted pleasure, the promise is deemed illusory and it provides no consideration. (See *J. C. Millett Co. v. Park & Tilford Distillers Corp.* [N.D. Cal.], 123 F. Supp. 484, 493.)

'Where a contract imposes no definite obligation on one party to perform, it lacks mutuality of obligation. It is elementary that where performance is optional with one of the parties no enforceable obligation exists. [Citations.]' " (*Kowal v. Day* (1971) 20 Cal.App.3d 720, 724 [98 Cal. Rptr. 118].)

An agreement is illusory and there is no valid contract when one of the parties assumes no obligation. [Citation.]" (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 94-95.)

The settlement agreement signed by Plaintiff on September 3 provides the following language:

- 9 -
Trial Brief before Trial

This e-copy is the official court record (incorated).

"any funds owed to Dan that are clearly and legally documents as official loans by Dan to the corporation will be determined by an accredited outside and neutral Certified Public Account. Such funds will be repaid one the Company has regained its financial footing and all past due debts are brought current, all pending judgements against the Company are resolved and that sufficient operating capital is on hand to meet current business requirements including update of the aircraft fleet and maintenance operations. Further, in consideration of Dan Yoon's family, in approximately 12 to 18 months, subject to the complete financial recovery of KS Aviation Inc., and all it's associated entities, a sum of money, to be determine by the board of directors and any future investors will be provided to Dan Yoon and family, based on the following conditions:

 a). The company has shown continued trend toward growth and profitability.

 b). When, if and as an investor purchased equity in KS Aviation Inc. And its entitles, the investor will have the right to determine the amount of funds given to Dan Yoon."

The above language destroys Plaintiff's ability to enforce repayment of sums loaned

to KS until plaintiff can establish:

 1). KS has regained its financial footing;

 2). All past due debts are brought current;

 3). All pending judgements against the Company are resolved;

 4). Sufficient operating capital is on hand to meet current business requirements including update of the aircraft fleet and maintenance operations; and finally,

 5). Investor will have the right to determine the amount of funds given to Dan Yoon.

These conditions for repayment make this contract illusory.

- 10 -
Trial Brief before Trial

This e-copy is the official court record (SC-8U13U/A).

Economic Duress: California courts have recognized the economic duress doctrine in private sector cases for at least 50 years. (*Young v. Hoagland* (1931) 212 Cal. 426, 430-432 [298 P. 996, 75 A.L.R. 654].) fn. 1 The doctrine is equitably based (*Burke v. Gould*, supra, 105 Cal. at p. 281) and represents "but an expansion by courts of equity of the old common-law doctrine of duress." (*Sistrom v. Anderson* (1942) 51 Cal.App.2d 213, 220 [124 P.2d 372].) [1] As it has evolved to the present day, the economic duress doctrine is not limited by early statutory and judicial expressions requiring an unlawful act in the nature of a tort or a crime. (Civ. Code, § 1569, subd. 2; fn. 2 *Burke v. Gould*, supra, 105 Cal. at p. 282; see generally 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 337-338, pp. 284-286; 13 Williston on Contracts (3d ed. 1970) §§ 1601, pp. 648-649, 1602, pp. 650-651, 656-657.)

The doctrine now may come into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure. (*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 203-205 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]; *Louisville Title Ins. Co. v. Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 799-802 [132 Cal.Rptr. 63]; *Thompson Crane & Trucking Co. v. Eyman* (1954) 123 Cal.App.2d 904, 908-910 [267 P.2d 1043]; accord, *Totem Marine T. & B. v. Alyeska Pipeline, Etc.*, supra, 584 P.2d at pp. 22-23; see also 13 Williston on Contracts, supra, § 1603, pp. 663-665, 1617, pp. 704, 706.)

When concerned with the essential elements of consent, a careful distinction must be made between a consent that is not free because it was obtained by duress, menace, fraud, undue influence or mistake (Civ. Code, §§ 1565, 1567) and a consent

Case: 19-42763    Doc# 159    Filed: 04/23/21    Entered: 04/23/21 16:24:24    Page 22 of 40

This e-copy is the official court record (JSC-81761).

that is not mutual because the parties did not agree upon the same thing in the same sense (Civ. Code, §§ 1565, 1580). (See 1Williston on Contracts (3d ed. 1957) § 20, pp. 35-36.) In the situation where the consent is not free the contract is not absolutely void, but may be rescinded by the parties. (Civ. Code, § 1566.) In the situation where the consent is not mutual, it generally is stated there is no contract. (*German Sav. and Loan Soc. v. McLellan* (1908) 154 Cal. 710, 716 [99 P. 194]; *Carlson, Collins, Gordon & Bold v. Banducci* (1967) 257 Cal.App.2d 212, 222 [64 Cal.Rptr. 915].)

Contractual provision will not be given effect if the consent of one of the parties to the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake. An 'adhesion' contract, namely one that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms.

Material Breach of Contract: The elements of a cause of action for breach of contract are well known. A plaintiff must establish: the existence of a contract, plaintiff's performance (or excuse for non-performance), defendant's breach, and resulting damages. (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958 at p. 968.)

When one party to a contract breaches a material term of the contract, the other party has the option to terminate the contract for cause. (See, e.g., *B. L. Metcalf General Contractor, Inc. v. Earl Erne, Inc.* (1963) 212 Cal.App.2d 689, 693; see also *Wood, Curtis & Co. v. Scurich* (1907) 5 Cal.App. 252, 254 ["the refusal of one party to a contract to make payment as called for by the terms of a contract excuses the other party from further performance on his part"].)

- 12 -
Trial Brief before Trial

This e-copy is the official court record (GCBB101).

Assuming the court does not find: <u>Attorney Misconduct and Misrepresentation</u>; <u>Illusory Contract</u>; and <u>Economic Duress</u>, Plaintiff asserts KS has done nothing to support the covenants in this contract. There has been no effort to document the transfer of Air Center Development LLC, or Plaintiff's interest in the EB-5 certification. Nor has there has been a neutral CPA determination of the amount due to Plaintiff for his cash contributions to KS from 2004 to 2016.

**5. <u>Witnesses</u>:**

Plaintiff will call the following witnesses:

- <u>Daniel Yoon</u> will describe the facts and circumstances surrounding his meetings with John Yoon's lawyer, Vincent Kim, and the preparation and execution of the settlement agreement on September 3, 2016.

- <u>Jong-Ki Yoon</u> was present during the execution of the settlement agreement on September 3, 2016.

- <u>John Yoon</u> signed the settlement agreement on September 2, 2016 and was present when Daniel Yoon signed the agreement on September 3, 2016;

- <u>Lance Lippencott</u> sent a red-lined copy of Vincent Kim's settlement agreement to Daniel Yoon on September 2, 2016, which pointing out the agreement's problems, which was Inadvertently forwarded back to Vincent Kim;

- <u>Jaymin Vaghashia</u>, Deputy Trial Counsel, State Bar California will provide information on Vincent Kim's admissions resulting in a private reproval

from his obtaining Danial Yoon's signature on the settlement agreement without the knowledge or consent of his counsel, Cyril Lawrence.

- <u>Cyril Lawrence</u>, attorney will provide information on Kim's violations of State Bar Rule 2-100, and his lack of awareness of a settlement agreement ready for execution by the parties.

**6.  Plaintiff's Conclusion**

- Plaintiff asserts the settlement agreement is unenforceable for the following reasons:

    1. The settlement agreement was obtained by opposing counsel in violation of Rule 2-100.;

    2. The settlement agreement is illusory, not subject to enforcement;

    3. The settlement agreement was obtained under economic duress; and

    4. Lack of material performance of the settlement agreement by KS.

Respectfully submitted:

DATE: August 5, 2019

CYRIL LAWRENCE, INC.
A PROFESSIONAL LAW CORPORATION
/s/ Eric S. Beiswanger
ERIC S. BEISWANGER

- 14 -
Trial Brief before Trial

This e-copy is the official court record (e-CR87150).

FILED
MERCED COUNTY

2019 OCT 15 PM 4:32

CLERK OF THE SUPERIOR COURT

DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF MERCED

| | |
|---|---|
| DAN YOON,<br><br>Plaintiff,<br><br>v.<br><br>K.S. AVIATION, INC.; JOHN YOON;<br>CHEN ZHAO aka ERIC ZHAO; XING<br>KONG AVIATION SERVICE LLC, and<br>DOES 1 to 20,<br><br>Defendant.<br>——————————————————<br>KS AVIATION, INC.; JOHN YOON,<br><br>Cross-Complainants,<br><br>v.<br><br>DAN YOON; and ROES 1 through 50,<br>inclusive,<br><br>Cross-Defendants | Case No. 17CV-00630<br><br>STATEMENT OF DECISION |

ISSUES

The enforceability of the September 2, 2016 Settlement Agreement between John Yoon

(John) and Dan Yoon (Dan) requires adjudication of the following issues:

1. Was Dan's consent to the Settlement Agreement procured by fraud, duress, menace or
   undue influence?

2. Does the Agreement lack mutuality of obligations?

3. What are John and Dan's respective obligations under the Agreement?

- 1 -

STATEMENT OF DECISION
DAN YOON v. K.S. AVIATION, INC., et al. CASE #17CV-00630

EX. "C"

4. Did Dan breach the Agreement?

5. Is John entitled to specific performance?

6. Did John and KS Aviation Inc. (KS) breach the agreement in a material respect?

7. Is the Agreement unconscionable?

## APPLICABLE LAW

Consent to a contract must be freely given. Cal. Civil Code § 1565. Consent obtained by duress, fraud or undue influence is not freely given Cal. Civil Code § 1568. Duress requires commission of a wrongful act or threat to pressure a party to consent to the contract. The party pressured must be so afraid or intimidated by the wrongful act or wrongful threat that he did not have the free will to refuse to consent to the contract and the consenting party would not have consented to the contract without the wrongful act or threat. Cal. Civil Code § 1567, 1568. An agreement obtained by threat of criminal prosecution constitutes menace and is unenforceable. *Bayscene Resident Negotiators v. Bayscene Mobilehome Park* (1993) 15 Cal App 4th 119,127. However, the other contracting party cannot sustain an action for duress when the voluntary action of the party is induced by his speculation upon or anticipation of a future event suggested to him. *Goldstein v. Ench* (1967) 248 Cal App 2d 891, 894-895. Undue influence consists of a person holding a position of trust or confidence pressuring a party to consent to a contract that the pressured party would not have otherwise consented. Undue influence overcomes freely given consent by grossly oppressive and unfair advantage of another's distress. Cal. Civil Code § 1575. Actual fraud requires suggestion of an untrue fact, known to be untrue to persuade a party to agree to the contract and the relying party reasonably relied on the false representation and would not have entered into the contract had they known the truth. Cal. Civil Code § 1572.

A contract is subject to specific performance after a breach if the plaintiff establishes each of the following:

1. Inadequacy of the legal remedy;

2. The underlying contract is both reasonable and supported by adequate consideration;

3. The existence of a mutuality of [obligations];

///

- 2 -

Case: 19-42763   Doc# 159   Filed: 04/23/21   Entered: 04/23/21 16:24:24   Page 27 of 40

DAN YOON v. KS AVIATION, INC. et al. CASE #17CV-00630

4. The contract terms are sufficiently definite to enable the Court to know what it is to enforce; and

5. A substantial similarity of the requested performance to that promised in the contract.

*Tamarind Lithography Workshop Inc. v. Sanders* (1983) 143 Cal.App. 3d 571, 575; *Henderson v. Fisher* (1965) 236 Cal.App. 2d 468, 473; *Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App. 4th 463, 472.

Contracts for the transfer of stock in a closed corporation have long been held to be subject to specific performance. *Senter v. Davis* (1869) 38 Cal. 450; *Treasurer v. Commercial Coal Mining Co.* (1863) 23 Cal. 390. Specific performance to transfer corporate stock in a closed corporation will be ordered if the stock has no market or ascertainable value. *Krouse v. Woodwork* (1895) 110 Cal. 638.

*California Civil Code section 3386* provides:

"Notwithstanding that the agreed counter-performance is not or would not have been specifically enforceable, specific performance may be compelled if:

(a) Specific performance would otherwise be an appropriate remedy; and
(b) The agreed counter performance has been substantially performed or its concurrent or future performance is assured or, if the court deems necessary, can be secured to the satisfaction of the court."

**DAN'S CONSENT TO ENTERING INTO THE SETTLEMENT AGREEMENT WAS NOT PROCURED BY FRAUD, DURESS, OR UNDUE INFLUENCE. DAN'S CONSENT TO THE AGREEMENT WAS FREELY AND KNOWINGLY GIVEN.**

Dan contends the following facts negate his consent to the contract: Attorney Kim's violation of the Canons of Ethics in communicating directly with Dan to settle the disputes between Dan and John without Dan's attorney's present. John's representations that if he and Dan settled their respective claims against each other, that he would report the changes to the District Attorney to get the DA to cooperate. John would try to get the KS employees to drop their legal claims against Dan. Attorney Kim allegedly threatened that without their help Dan was going to jail.

///

///

- 3 -

DAN YOON v. K.S. AVIATION, INC., et al, CASE #17CV-00630.
Case: 19-42763   Doc# 159   Filed: 04/23/21   Entered: 04/23/21 16:24:24   Page 28 of 40

At the time of the settlement agreement, Dan was facing four felony counts of forgery and falsification of corporate documents. Trial was set to commence on September 13, 2016. In addition, KS Aviation did not have sufficient funds to meet payroll. KS Aviation was delinquent in its rent, and accounts payable. Sierra Development Company had defaulted on the simulator loans. Under these circumstances, Dan wanted the criminal case resolved without a felony conviction and/or the risk of substantial jail time. Dan had personal and financial incentives to enter into the settlement agreement.

Dan was not a credible witness. With respect to the criminal charges, Dan testified he did not forge or falsify any documents. The facts belie his testimony. The forged documents benefited Dan and no one else. One of the documents allocated ownership in Sierra Development Company 65% to Dan, thereby giving him control of the business. A KS Board of Directors Meeting Minutes authorized a million-dollar bonus to Dan. One of the documents contained John's the personal history, which was necessary to obtain the SBA simulator loan. Dan was negotiating and submitting all the paper work for the loan. Another document was a Secretary of State Statement of Information listing the corporate officers. The evidence presented at the preliminary hearing in the criminal case was that all of the signatures on the documents in question were forged. John's signature was not the only forgery. Two other individuals told the DA investigator that their signatures on the Corporate Minutes were not theirs and that they never attended the alleged Board of Directors meeting. The only one to benefit from these documents was Dan, both financially and to establish management and control of the business. Whether he personally forged the signatures, conspired to, or aided and abetted the creation and forged documents is immaterial. Cal. Civil Code § 1565

Dan testified that attorney Kim approached him at a funeral to negotiate a settlement. Dan testified that attorney Kim instructed him not to discuss the proposed settlement with his lawyer. In contrast, attorney Kim testified that Dan came to his office without an appointment to discuss the case. Kim told him he could not talk to him without his attorney present. Dan told Kim he had already discussed it with his attorney and had agreed that Dan could talk directly with Kim. Kim testified that Dan seemed desperate to settle the matter. At the time, Dan was primarily

- 4 -

STATEMENT OF DECISION

concerned about the forthcoming criminal trial. In addition, Dan did not want to contribute any additional funds to KS. KS lacked sufficient funds to meet payroll. His wife was ill due to the stress. Dan was facing or threatened with at least four lawsuits by KS employees for sexual harassment, hostile workplace, and/or battery.

Dan testified that he believed that the Settlement Agreement only required that he do whatever was necessary to withdraw from all management and control of KS but that he was not required to transfer his KS stock. The agreement is clear that Dan was to relinquish and transfer all of his shares to KS.

On September 20, 2016, Dan swore under penalty of perjury that he was not a KS shareholder. Yet, to date asserts he is a shareholder and has tried to force the calling of a shareholder meeting.

Although Dan is Korean and speaks with an accent, he has years of experience with complicated business matters. He has operated a restaurant with numerous employees for many years. He negotiated leases, real estate purchases, multi-million dollar loans and a contract for a five million dollar simulator. He has hired and used attorneys and CPA's for numerous business entities including corporations and limited liability companies. He owned and managed companies with 30 or more employees. He reads and understands English.

Dan's management of KS Aviation evidenced a "controlling" personality. He was frustrated with the fact that a settlement with John had not been reached. Settlement negotiations began in April, 2016. And by the end of August, 2016 no settlement was apparent. Dan initiated the contact with attorney Kim. Dan chose not to involve his attorney. In fact, on September 6, Dan told his attorney that he had settled with John and instructed attorney Lawrence to dismiss his lawsuit against John. Attorney Lawrence asked to see the settlement agreement, however, Dan decided not to give him a copy until days or two weeks later. Nothing prevented Dan from properly forwarding a copy of the agreement to attorney Lawrence. It was Dan's decision to delay informing Lawrence of the settlement agreement. Dan wanted the terms of the settlement agreement executed properly because of the pending criminal trial. Even though attorney Kim

/ / /

- 5 -

Case: 19-42763   Doc# 159   Filed: 04/23/21   Entered: 04/23/21 16:24:24   Page 30 of 40

1   violated the Canons of Ethics by having contact with Dan, it was Dan's decision not to involve

2   his attorney. Dan acted freely and voluntarily.

3       The evidence does not support duress based upon alleged threats of criminal process. The

4   felony charges pending against Dan had substantial merit. Dan's denial of criminal culpability

5   lacks credibility. Dan, in fact, received the benefit of John's cooperation in connection with the

6   criminal case. The fact that Dan had a written settlement agreement with John settling all of their

7   disputes provided Dan with necessary information to induce the DA to reduce and settle the

8   criminal charges. John was the party aggrieved by Dan's alleged criminal conduct. The

9   aggrieved party was satisfied with the settlement. The criminal trial was continued and the case

10  settled in April, 2017 with the four felony charges reduced to misdemeanors. Dan was sentenced

11  to probation with no jail time. In addition, he was allowed to enter a plea of "No Contest in

12  Abstentia."

13      Dan argued that his attorney had no input into the settlement agreement. The testimony

14  of Lance Lippincott and the e-mail exchange does not support this position. On the Friday before

15  the settlement agreement was signed, Lippincott had forwarded an e-mail with proposed revisions

16  to the settlement agreement. Attorney Kim incorporated Lippincott's revisions into the final

17  settlement agreement. The evidence supports findings that attorney Lawrence's office did have

18  input into the final settlement agreement.

19      In addition, Dan testified that over the years he contributed millions of dollars to KS and

20  made no withdrawals until 2013-2014 when KS Aviation turned profitable. Dan testified he only

21  received 10 months of $25,000.00 per month salary. He denied receiving any payments on the

22  loans he made to the corporation. In contrast, Josh McDaniel testified that KS had a CPA do a

23  forensic accounting, which showed that Dan had used over $4 million of KS funds for personal

24  use. The corporate minutes containing the forged signatures authorized a $1 million payment to

25  Dan.

26      Based on all the above, the evidence does not support Dan's contention that he was

27  fraudulently induced to enter into the settlement agreement. Attorney Kim's misconduct did not

28  nullify Dan's free will to enter into the settlement agreement. The fact that Dan was feeling

- 6 -

STATEMENT OF DECISION

DAN YOON v. KS AVIATION, INC. et al. CASE #17CV 00630

Case: 19-42763   Doc# 159   Filed: 04/23/21   Entered: 04/23/21 18:24:24   Page 31 of 40

economic duress and personal family stresses were legitimate reasons for him to agree to the settlement. Dan acted on his own to get an expeditious settlement of the disputes with John and have a written agreement documenting the settlement. Having the executed agreement provided negotiating leverage with the DA in the criminal case. Nor does the evidence support a finding that Dan's free will was overcome by duress or undue influence. The fact that he did not want to have to contribute any more money to KS, that the only chance he had of obtaining any money from KS was if John could find a new investor, that Dan felt stressed because KS employees were filing claims for his alleged mistreatment and that he had concerns for his wife's health were all legitimate reasons to freely enter into the agreement.

### THERE IS MUTUALITY OF OBLIGATION IN THE AGREEMENT

In the instant case, Dan agreed to the following:

> "Dan agrees he shall withdraw from all daily affairs of the KS Aviation, Inc. or executive duties and responsibilities as a senior executive or as a member of the board of directors of KS Aviation Inc. including Sierra Academy of Aeronautics. Therefore, effective on the date indicated above, Dan shall submit his resignation as CFO of KS Aviation Inc. and any and all other positions, as well as his membership on the board of directors."

> "Dan agrees to relinquish all his shares of stock in KS Aviation Inc., return all his shares to the corporation, and agrees to return any and all company property, including vehicles, computers, telephones, software, keys, company credit cards, and any and all airport security passes."

Dan agreed to give up his ownership and management in KS. John would be the majority shareholder and have full management and control of the business. Dan further agreed that the simulator belonged to KS.

Dan agreed to dismiss his pending lawsuits against John and KS within 5 days.

Dan agreed to have no further contact with John, his family, or any KS employees, contractors, consultants, or other individuals doing business with KS.

Dan agreed not to enter into any business related to training of pilots for four years.

John and KS agreed to do the following:

1. Relinquish all interest in Sierra Air Center Development, LLC and EB5 programs to Dan.

- 7 -

Case: 19-42763   Doc# 199   Filed: 04/23/21   Entered: 04/23/21 16:24:24   Page 32 of 40

2. Repay all legally documented KS loans made by Dan as determined by a neutral CPA when:

   a. KS has paid all past due debts as of 9/2/16;

   b. KS has resolved all judgments against it as of 9/2/16;

   c. KS has sufficient operating capital to meet operating requirements including updating the aircraft fleet and maintenance operations.

3. In addition to the loan payments, KS would pay to Dan's family in 12-18 months a sum to be determined and contingent upon the following:

   a. The company showing a continuing trend toward growth and profitability;

   b. The Board of Directors determining the amount or

   c. if a new investor purchased equity in KS, the investor would determine the amount to be paid;

   d. Payments would be made annually and based on company profitability to be determined by an outside neutral certified public accountant;

4. KS assumed liability for the simulator loans and agreed to make the loan payments. If the loans became delinquent and the creditors sought enforcement against Dan, John and KS agreed to indemnify Dan for any liability he may face on those loans.

5. John and KS agreed to dismiss all lawsuits against Dan within 7 days.

John and Dan agreed to a comprehensive mutual release of all claims of any kind or nature, known or unknown, actual or potential they may have against each other. The release was so broad that it would bind KS as well since John was the controlling shareholder and officer. Each party agreed to a California Civil Code 1542 waiver.

Dan argues that the promise to repay his corporate loans and future payments from profits are illusory because they were conditioned upon events the parties knew would never occur, the provisions are too vague for a court to enforce and the promise of future payments from profits was entirely discretionary. The promise to repay Dan's corporate loans was conditioned upon establishing the validity of the loans by a neutral CPA. This condition is enforceable should Dan contend that some of his loans were wrongfully denied by the CPA. Whether the financial records

- 8 -

STATEMENT OF DECISION

THIS e-copy is the official court record (SCV-00630)

1    documented the loans in accordance with acceptable accounting practices is something a Court

2    could resolve, if needed. Payment of all KS's "past due" debts and judgments as of 9/2/16 is

3    also an issue that could be adjudicated by the court should Dan believe John and KS were not

4    acting reasonably or in good faith. Dan testified that KS had $3 million in receivables and $2

5    million in debts as of 9/2/16. KS disputed Dan's testimony. In addition, the settlement envisioned

6    John locating a new investor.

7        The Agreement does not contain a true "integration" clause. Extraneous evidence is

8    considered to determine the intent of the parties. The intent of the parties was primarily as

9    follows:

10       John wanted Dan to terminate his management, control, and ownership in KS and agree

11   that KS owned the simulator.

12       Dan wanted a written agreement providing for the settlement of all of John's and KS's

13   claims of Dan's alleged wrongful acts to be used to help Dan in the pending criminal case. Any

14   prior suggestions for help were problematic as they either could be used to show encouragement

15   of subordination of perjury or obstruction of justice. Dan wanted a means to collect the loan notes

16   he contended KS owed. Dan wanted Sierra Air Center Development and the EB5 program

17   entities. Dan did not want to have to contribute any more moneys to pay KS's obligations. Dan

18   wanted to be indemnified for any liability on the simulator loan and resultant judgments.

19       Both Dan and John wanted to resolve all claims, known and unknown they had against

20   each other except for the above matters.

21       Dan did not have a reasonable expectation that he would receive future KS payments in

22   approximately 18 months should KS become past debt fee, profitable and growing. In September,

23   2016, KS was insolvent, or close to it. The company's future was dependent upon locating a new

24   investor. No prospects were apparent on 9/2/16. Financial survival was questionable. John was

25   able to convince Chen Xhao, CEO of Xing Kong to purchase KS in May, 2017. Xing Kong

26   advanced millions to continue the business operations. The low expectation that John or his family

27   would receive any future payments is further evidenced by the fact both John and Dan agreed that

28   making any future payments was within the discretion of the KS Board of Directors and/or the

new investor. Dan could challenge the denial of any payments only if he could prove that all KS debts and judgments had been paid, the company was profitable and growing and that the board and/or the investor acted in bad faith.

Dan argues that Sierra Air Development and the EB5 program were valueless because Sierra had no assets and there is nothing to transfer under the EB5 program. Dan had managed Sierra Air Development and the EB5 program for years. If he thought he could use this entity and program to his benefit, he bore the risk. The agreement specifically provided that the simulator would belong to KS, not Sierra Air Development.

Dan got the benefit of dismissal of the lawsuits against him. KS settled the employee claims. The claims all arose out of alleged Dan's alleged misconduct.

John and KS are liable to indemnify Dan against any sums he is forced to pay on the simulator loans and resulting judgments. This remains to be resolved. This is a matter of money damages. The issues of performance and/or excused performance due to Dan's breach in falling to transfer his KS stock, alleged failure to cooperate with completing Bank of the West documents, etc. are all issues yet to be tried.

One of the most valuable considerations Dan received was the general release of all known and unknown claims that John and KS had against Dan as of 9/2/16. The release bars any claims for alleged misappropriation of KS funds for personal use. It bars any offset claims KS may have against KS's and John's obligation to indemnify Dan for any moneys he ends up paying to Bank of the West on the simulator loan judgment. It bars any offset claims KS may have against valid unpaid loans Dan made to KS. KS is still entitled to credits for payments it made on the loans, but not for non-loan payments amounting to misappropriation of corporate funds for personal use. KS and John may have other defenses to the indemnity action and/or loan collection complaint based on facts occurring after the 9/2/16 agreement. Those issues remain to be adjudicated under Dan's complaint in the current action.

Based on all the above, there was mutuality of obligations set forth in the agreement.

///

///

- 10 -

Case: 19-42763   Doc# 159   Filed: 04/23/21   Entered: 04/23/21 16:24:24   Page 35 of 40

## THE SETTLEMENT AGREEMENT IS NOT UNCONSCIONABLE

Dan is an experienced and sophisticated businessman. He and John were equals as far as bargaining positions. Both were experienced in hiring and using attorneys and CPAs. The fact that Dan chose to represent himself in finalizing the settlement agreement and that John was represented by attorney Kim did not shift the balance of bargaining positions to the point that that Dan had no bargaining power. He could have followed his son's advice and not signed the agreement. He chose to enter into the agreement. The terms of the agreement are not unconscionable. Dan received most of the consideration he sought through and under the agreement.

## AN UNJUST RESULT WOULD OCCUR IF DAN IS NOT REQUIRED TO TRANSFER HIS KS STOCK AS HE HAS RECEIVED SUBSTANTIAL BENEFIT UNDER THE AGREEMENT

The agreement clearly helped to settle the criminal charges. Dan did not have to contribute more operating capital to KS to cover payroll, unpaid taxes, employee's claims, operating expenses etc. KS settled the employee claims. Dan is seeking rescission relief without complying with  Cal. Civil Code § 1691 which requires each party to the contract to restore to the other everything of value received under the contract. He has not and cannot restore the benefits he received with and under the contract.

## KS AND JOHN ARE ENTITLED TO SPECIFIC PERFORMANCE OF THE CONTRACT

The value of the KS stock at the time of the breach cannot be determined. Any value was contingent upon Xing Kong willing to purchase KS. Xing Kong agreed to purchase KS on condition that John transfer 100% of KS. John and Dan are the controlling shareholders. Although there are a few minority shareholders, Chen Xhao, (Xing Kong's owner) made it clear he would not purchase KS if Dan was a shareholder or in any way involved with the business. John needs Dan's stock or KS will lose its investor. Determination of money damages due to Dan's breach is difficult if not impossible to determine.

/ / /

/ / /

- 11 -

STATEMENT OF DECISION
DAN YOON v. KS AVIATION, INC. et al. CASE #17CV-00630

Case: 19-42763   Doc# 159   Filed: 04/23/21   Entered: 04/23/21 16:24:24   Page 36 of 40

**ALTHOUGH KS AND JOHN HAVE NOT FULLY PERFORMED ALL THEIR OBLIGATIONS UNDER THE CONTRACT, THESE UNFULLFILLED OBLIGATIONS ARE CAPABLE OF BEING SATISFIED BY MONEY DAMAGES.**

Dan argues that John and KS have not paid his loans nor have they indemnified him for the Bank of the West judgment. The loans are in dispute and need to be adjudicated in accordance with the terms of the agreement. It is unclear under the law of indemnity, whether Dan is entitled to some form of compensation with respect to the Bank of the West judgment. In addition, KS did take some action towards the loan assumption but Dan did not complete any of the paper work. Realistically, Bank of the West was unlikely to release any guarantor from liability on the simulator loan. The law is capable of fully compensating Dan for both of these alleged breaches, if in fact, John and/or KS breached the contract. Therefore, these issues do not bar John and KS from specifically enforcing the contract requiring Dan to transfer his KS stock. Cal. Civil Code § 3392.

## DECISION

The Settlement Agreement dated September 2, 2016 is enforceable. Dan's motion to compel a KS shareholder meeting is denied. Dan breached the agreement by failing to transfer his stock to KS. John and KS are entitled to specific performance of the agreement under their cross-complaint. Dan is ordered to transfer all of his KS stock to KS forthwith. The court retains jurisdiction under CCP section 664.6 to enforce this portion of the judgment to be entered herein.

The issues of costs and attorneys fees are deferred until after adjudication of the complaint.

DATED: October 15, 2019

_Ronald W Hansen_

RONALD W. HANSEN
Assigned Judge of the Superior Court

- 12 -

# PROOF OF SERVICE BY MAIL
## (1013a, 2015.5 C.C.P)

STATE OF CALIFORNIA      )
                                    )

COUNTY OF MERCED       )         Case No. **17CV-00630**

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is Merced County Superior Court, 627 West 21st Street, Merced, California 95340.

On **October 15, 2019,** I served the within **STATEMENT OF DECISION** on the person(s) named below by placing a true copy thereof in an envelope and then placing in the Merced County Superior Court/Clerk's outgoing mail addressed as follows:

**Cyril Lawrence, Esq.**                **Michael L. Abbot, Esq.**
**2111 "K" Street**                      **126 S. Third Avenue**
**Merced, CA 95340**                  **Oakdale, CA 95361**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **October 15, 2019**, at Merced, California.

Claudia N. Juárez, Declarant

Michael L. Abbott, Esq. CSB 148917
Law Offices of Michael Abbott
126 South Third Avenue
Oakdale, CA 95361
Telephone: (209) 567-1400
Facsimile: (209) 567-1002

Attorney for Creditor and Plaintiff , K.S AVIATION, INC.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

In regards to:

DANIEL B. YOON                        )          Case No. 19-42763 CN 11
JEENEE S. YOON                        )
                                      )
        Debtor(s).                    )          Chapter 11
                                      )
                                      )
_____ )

## **CERTIFICATION OF SERVICE**

       I, the undersigned, declare that I am over the age of eighteen (18) years and am not a party to the within-entitled action; my business address is Law Offices of Michael Abbott, 126 South Third Avenue, Oakdale, CA 95361

       On April 23, 2021, I served the attached document(s):

       **OBJECTION TO DEBTORS' PLAN OF REORGANIZATION**

on all interested parties in said case addressed as follows:

Lawrence L. Szabo                     Jose Raul Alcantar Villagran
Attorney at Law                       Nassiri & Jung LLP
3608 Grand Avenue                     1700 Montgomery Street, Suite 207
Oakland, CA 94610                     San Francisco, CA 94111

BY MAIL: I placed a true and correct copy thereof in a sealed envelope with postage fully paid. I am readily familiar with the business' practice for collection and processing of mail for delivery by the United States Post Office. Correspondence so placed would be deposited with the U.S Post Office that same day in the ordinary course of business.

Executed April 23, 2021 in Oakdale, California

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

By : _____
Michelle Kendig